UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| T.J., a minor, by and through her mother and next friend TIQUA JOHNSON :<br>*Plaintiff* :<br>v. :<br> :<br>DARREN ROSE, alias, individually and in his :<br>official capacity as a Pawtucket Police Officer, :<br>and LISA BENEDETTI RAMZI, alias, :<br>individually and in her official capacity as :<br>Principal of Goff Junior High School, and :<br>CITY OF PAWTUCKET, by and through its :<br>Finance Director, Joanna L'Heureux :<br>*Defendants* : | C.A. No. 20-cv- |

**COMPLAINT**

**I. Introductory Statement**

1. Through this civil action, Plaintiff seeks a declaratory judgment, injunctive relief, and compensatory and punitive damages for acts and/or omissions of Defendants in violation of Plaintiff's rights to freedom from unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983, and under Article 1, §§ 2 and 6 of the Rhode Island Constitution, as well as violations of statutory and common law of the State of Rhode Island.

2. This action stems from the school-based arrest of T.J. at Goff Junior High School on June 3, 2019, more than an hour after a minor scuffle between T.J. and another girl. The incident, in which another student swung at T.J. and T.J. responded in kind, took place outside the school, before the start of the school day, and resulted in no injuries. A school

administrator, James Diko, was standing approximately five to ten feet from T.J. but made no move whatsoever to intervene. In less than one minute, the conflict was resolved by other students.

3.  Defendants arrested T.J. approximately one hour after the incident, while she was sitting quietly in the guidance office and in the presence of her mother. T.J. had been fully compliant with school personnel since the moment the incident ended, and her arrest was in violation of R.I. Gen. Laws §12-7-3, which allows warrantless arrest for misdemeanor offenses *only if* an officer "has reasonable ground to believe that person cannot be arrested later or may cause injury to himself or herself or others or loss or damage to property unless immediately arrested."

4.  Defendant Rose, with the knowledge and consent of Defendant Ramzi, arrested T.J. *not* for any reason having to do with safety but because he wanted "to make an example" of this child by publicly displaying her being arrested. The malice that Defendant Rose displayed was evident in his proclamation to the student body, made earlier in the year, that he was "itching to get his handcuffs on somebody," or words to that effect.

## II. Parties

5. Plaintiff T.J. ("T.J." or "Plaintiff") is a minor child and resident of Pawtucket, Rhode Island. T.J. is a Black girl, who, at the time of the incident described herein, was thirteen (13) years old and a student at Goff Junior High School in Pawtucket. She files this action by and through her mother and next friend Tiqua Johnson. Tiqua Johnson ("Ms. Johnson") is the natural parent and legal guardian of T.J. and files this action on her daughter's behalf. At all times relevant to this complaint, Ms. Johnson was a resident of Pawtucket, Rhode Island.

6. Defendant Darren Rose ("Defendant Rose") is sued in his individual capacity and in his official capacity as a Pawtucket Police officer. At all times relevant to this complaint, he was assigned to Goff Junior High School as a School Resource Officer ("SRO") and was acting within the scope of his employment and under color of law.

7. Defendant Lisa Benedetti Ramzi ("Defendant Ramzi") is sued individually and in her official capacity as the Principal of Goff Junior High School during the 2018-2019 school year. At all times relevant to this complaint, she was acting within the scope of her employment and under color of law.

8. Defendant City of Pawtucket ("Defendant City" or "City") is a municipal corporation duly authorized and organized under the laws of the state of Rhode Island and is sued through its Finance Director, Joanna L'Heureux, the official designated by R.I.G.L. §45-15-5 to be named in a suit for relief against the City.

### III. Jurisdiction

9. This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV. Venue

10. Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391. Venue is also proper because a substantial part of the events and omissions giving rise to these claims occurred in the District of Rhode Island.

### V. Material Facts

11. T.J. began attending Goff Junior High School in October, 2018 as a seventh grader. By third quarter, she earned High Honors status for academic achievement, and was described by

her teachers in report card comments as "a pleasure to have in class," "mature and responsible," and "cooperative."

12. Before June 3, 2019, T.J. had never been involved in any form of physical altercation at school, nor had she been the subject of any formal disciplinary actions.

13. On Monday, June 3, 2019, T.J. arrived at school at approximately 7:40, her customary time, and chatted with friends in the school yard while she waited for the bell to ring.

14. Over the previous weekend, T.J. had attempted to support a friend of hers by joining a contentious online discussion with approximately six other Goff students.

15. One of the students involved in the conversation, M.P., told multiple students that she planned to fight with T.J. when T.J. arrived at school.

16. In the school yard that Monday morning, M.P. started to approach T.J. Another student moved to block M.P.'s path, but M.P. stepped around him. When she reached T.J., M.P. threw a punch at T.J.'s face.

17. T.J. responded by punching M.P., and the two girls grappled for a very brief period. Two other students intervened and brought a quick halt to the conflict.

18. After other students separated the girls, there was a brief moment of renewed contact between M.P. and T.J. Again, other students present separated the girls and there was no further physical contact between them.

19. The entire incident lasted less than sixty (60) seconds.

20. During the incident, school administrator James Diko ("Mr. Diko") was standing less than ten feet from T.J. and M.P. However, Mr. Diko took no action to separate T.J. and M.P. or to intervene until after the altercation was over.

21. Activity in the school yard quickly returned to the regular routine of students waiting for the building to open. There was no further disruption.

22. Other than the students who acted quickly and calmly to separate the girls, the only students involved in the incident were M.P. and T.J. After the incident was over, Assistant Principal Liana Maris came out to the yard and brought T.J. into the building, while another administrator brought M.P. inside.

23. T.J. followed every instruction and complied fully with every adult who addressed her following the initial incident with M.P.

24. Administrators first brought T.J. to the guidance office and M.P. to the nurse's office, then brought T.J. to the nurse's office, and back to the guidance office without incident.

25. The school nurse confirmed that neither student reported nor appeared to have suffered any injury from the incident. Eventually Defendant Ramzi came in the guidance office., Without asking what had happened, Defendant Ramzi, who had not seen the incident herself, began yelling at T.J.

26. T.J. sat still, quietly crying, as Defendant Ramzi berated her, telling T.J. that the fight was her fault, and yelling "What makes you think it's ok to hit people?"

27. T.J. told Defendant Ramzi that M.P. hit her first.

28. Meanwhile, Ms. Johnson received a call from the school and immediately left work and drove to the school. Defendant Ramzi, although she had not been present for the incident, began to explain what had taken place.

29. Defendant Rose came into the office and also started yelling at T.J., telling her that he had watched a video of the incident, and that it was all T.J.'s fault.

30. Defendant Rose neglected to mention that in the video he watched, taken from an outdoor camera, M.P. is not visible at the beginning of the encounter, and does not become visible until she charges at T.J. and swings at her.

31. The limited perspective provided by the video was obvious to anyone who viewed it, including Defendants Rose and Benedetti.

32. Upon information and belief Defendant Rose made no attempt to investigate the incident involving T.J. beyond watching the video, despite the fact that the camera's location prevents the viewer from seeing M.P. before she reached T.J.

33. Defendant Rose told T.J., who was still crying, that he was going "to make an example" of her by arresting her. Ms. Johnson asked who made the decision to arrest her daughter and Defendant Rose said that it was his decision. Defendant Rose repeated that he wanted "to make an example" of T.J. by arresting her.

34. Ms. Johnson replied that based on her years of experience working in a middle school, arrest was a radical and atypical response for an incident where no one was injured, and especially for a student who had never before been involved in a physical altercation.

35. Defendant Rose said that talking with students instead of arresting them "doesn't work," and refused to consider any alternative dispositions.

36. As the conversation ended, Defendant Rose prepared to handcuff T.J. and walk her through the school building handcuffed, for the rest of the students to see.

37. Ms. Johnson pleaded for him not to parade her daughter through the school handcuffed, and finally Defendant Rose agreed not to put handcuffs on T.J. yet, but insisted that she must be taken to the station in the police car, and that she must be handcuffed.

38. Defendant Ramzi was present for the entire conversation between Defendant Rose and Ms. Johnson and neither intervened nor disputed anything that Defendant Rose said.

39. Although T.J. was fully compliant with school administrators and police at all times, Defendant Rose called for assistance, and three additional Pawtucket Police officers (Day, Vasatka, and Pichardo) arrived at the school.

40. Officers Vasatka and Day perp-walked T.J. from the office on the second floor of the school to the door, past students, faculty, and staff.

41. T.J. was fully compliant as she was marched through the school and put in the car; however she continued to cry quietly.

42. Ms. Johnson asked if she could simply bring her daughter in her own car to the police station for processing, but Defendant Rose refused, despite the clear language of R.I. Gen. Law §12-7-3 that only allows immediate arrest for warrantless misdemeanor offenses if an officer has a reasonable belief that the subject cannot be arrested later, or may injure themselves or others or cause damage to property.[1]

43. Approximately one hour passed between the time of the scuffle in the school yard and the time that Defendant Rose contacted other officers to effectuate the arrest. During that hour, T.J. was quiet, respectful, and fully compliant with every instruction given to her.

44. At the police station, officers searched T.J., and took her photograph and fingerprints, and locked her in cell number nine in the same holding cell area used for adult men prisoners.

---

[1] The statute reads: "A peace officer may, without a warrant, arrest a person if the officer has reasonable cause to believe that the person is committing or has committed a misdemeanor or a petty misdemeanor, and the officer has reasonable ground to believe that person cannot be arrested later or may cause injury to himself or herself or others or loss or damage to property unless immediately arrested." R.I. Gen. Laws §12-7-3.

45. Defendants charged T.J. with Disorderly Conduct (R.I. Gen. Law §11-45-1) and finally released her to her mother.

46. In addition to the criminal charges, Defendant Ramzi ordered T.J. suspended from school for two (2) days.

47. When it came time for T.J. to return to school on Wednesday, June 5, she was unable to go, because of the anxiety and fear after having been arrested so publicly.

48. T.J. was unable to return to school until the end of the week, because of the emotional anguish and stress of having been arrested.

49. Later in July, 2019, T.J. went before the Juvenile Hearing Board, where the charges against her were disposed of on condition that T.J. write an essay about the incident.

50. In Fall, 2019, still unable to return to Goff, T.J. transferred to a private school where she could finish junior high school away from the presence of Defendant Rose and other factors that triggered the trauma of the gratuitous and damaging school-based arrest.

51. But for the Defendants' actions and failures to act, T.J. would continue her publicly-provided education.  Instead, because she is still facing great distress and mental anguish as a direct and proximate result of the events described herein, and aware of Defendant City's deliberate indifference toward the harm inflicted by the culture of policing within the Pawtucket Schools, especially toward Black girls (*see*, e.g., paragraphs 63-65, *infra*), T.J. must seek her high school education outside of the Pawtucket public school system.

52. As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, the Plaintiff has suffered and will continue to suffer mental anguish, personal injury, pain and suffering, injury to reputation, impairment of her

right to be free from unreasonable seizure, deprivation of her civil rights, expenses for legal services, and other great damage, for which she has no adequate remedy at law.

53. As of June 3, 2019, Defendant City's Mayor, Superintendent of Schools, Chief of Police, and School Committee Chair were aware that "any arrests or referrals to law enforcement can have negative consequences for students, and that students of color … may experience disproportionate contact with the justice system. For this reason, schools and the police department should carefully ensure that S.R.O.'s roles are focused on protecting the physical safety of the school or preventing the criminal conduct of persons other than students, while reducing inappropriate student referrals to law enforcement." (*Memorandum of Understanding Between Pawtucket School Department and Pawtucket Police Department*, executed November, 2016, "2016 MOU").

54. Policy statements and goals notwithstanding, Defendant Rose announced to students gathered in the cafeteria at lunchtime, one day in winter or spring of 2019, that he was authorized to arrest students, and words to the effect of, "I've been itching to get my handcuffs on someone."

55. The 2016 MOU includes no provision for assessment or evaluation of S.R.O. compliance with Federal or State law, nor with the stated principles and purpose set forth in that very document.

56. Upon information and belief, Defendant Rose received no training "on how to distinguish between, and appropriately respond to, disciplinary infractions appropriately handled by school officials on the one hand, and major threats to safety or serious criminal conduct that requires law enforcement involvement on the other." This clear deficiency in Defendant

Rose's training existed despite an admission by City policymakers in the 2016 MOU that such training was necessary.

57. Despite the stated acknowledgment by Defendant City's School Department and Police Department of the danger of disproportionate arrests of students of color, 71% (five out of seven) of the arrests at Goff Junior High School in the 2017-2018 school year were of Black children, and 56% (four out of seven) were of Black, non-Hispanic children, while the student body was approximately 14% Black, non-Hispanic.

58. For the 2018-2019 school year, when Plaintiff was arrested, 56% of student arrests were of Black (Hispanic or non-Hispanic) students, while upon information and belief, the proportion of Black students was similar to the previous year.

59. Black girls in particular have been disproportionately arrested at Goff, comprising 57% of students arrested in 2017-2018.

60. Upon information and belief, Defendant City provides no training, supervision, or discipline addressing the unreasonable seizure of school children or racial discrimination in school-based policing.

61. Defendant Rose, with the knowledge and consent of Defendant Ramzi, arrested T.J. *not* for any reason having to do with safety but because he wanted "to make an example" of this child by publicly displaying her being arrested.

62. The malice that Defendant Rose displayed was evident in his proclamation to the student body, made earlier in the year, that he was "itching to get his handcuffs on somebody," or words to that effect.

63. Defendant City's deliberate indifference and racial bias is further manifested in its acquiescence in other racially-biased actions of its SROs. For example, on March 31, 2019, James Baino ("Officer Baino"), a School Resource Officer employed by Defendant City of Pawtucket and assigned to William E. Tolman High School ("Tolman"), displayed on his personal Facebook page a photograph depicting himself with two Black female Tolman students. While the original photograph celebrated the students' scholastic accomplishments, the photograph posted by Officer Baino crudely superimposed white male faces over the students' faces.

64. Upon information and belief, Officer Baino was not disciplined or otherwise counseled by Defendant City for his publicly disrespectful actions toward Black female Pawtucket students.

65. Upon information and belief, as well as being employed as an SRO by Defendant City, Officer Baino was at all times relevant to this complaint, the president of Lodge Number 4, Fraternal Order of Police, the exclusive bargaining agent for labor agreements between police officers, including Defendant Rose, and Defendant City.

66. The actions of the individual defendants as aforesaid warrant the imposition of punitive damages upon each of them as allowable by law as follows:

    a.    as to claims under Rhode Island law: the conduct and actions of each individual Defendant were taken in a gross abuse of the Defendants' exercise of their individual and/or corporate powers, were motivated by malice or in bad faith and presents "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounts to criminality, which for the good of society and warning to the individual, ought to be punished." *Felkner v. RI College,* 203.A.3d 433, 461 (R.I. 2019).

b.  as to claims under federal law: the conduct of each individual Defendants was motivated by evil motive or intent or undertaken in reckless or callous indifference to federally protected rights of the Plaintiff.

## VI.  Claims For Relief

67. Plaintiff sent a notice of claim to the City of Pawtucket more than forty (40) days before this action.

68. Plaintiff hereby incorporates into the counts below the allegations contained in all preceding paragraphs (1 through 67) as if fully set forth herein.

### COUNT ONE
*Unreasonable Seizure in Violation of the Fourth and Fourteenth Amendments, Actionable Through 42 U.S.C. § 1983 Against All Defendants*

69. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in arresting Plaintiff, in violation of the Fourth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

### COUNT TWO
*Unreasonable Seizure in Violation of Article I, §6 of the Rhode Island Constitution, Against All Defendants*

70. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in arresting Plaintiff, in violation of Article I, §6 of the Rhode Island Constitution, causing Plaintiff to suffer harm as aforesaid.

## COUNT THREE
*Misdemeanor Arrest Without Warrant in Violation of R.I. Gen. Law §12-7-3*
*Against Defendant Rose and City of Pawtucket*

71. Defendant Rose, while acting in the scope of his employment, by his individual and/or concerted acts and/or omissions, including but not limited to those described herein, arrested Plaintiff at school, without reasonable ground to believe that Plaintiff could not be arrested later or that she would cause injury to herself or others or damage to property, in violation of Rhode Island General Laws, causing Plaintiff to suffer harm as aforesaid.

## COUNT FOUR
*Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection*
*Actionable Through 42 U.S.C. § 1983 Against All Defendants*

72. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, violated Plaintiff's right to equal protection under the law, on the basis of her race, causing Plaintiff to suffer harm as aforesaid.

## COUNT FIVE
*Violation of Plaintiff's Right to Equal Protection Under Article I, §2 of the Rhode Island Constitution, Against All Defendants*

73. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, violated Plaintiff's right to equal protection under the law, on the basis of her race, causing Plaintiff to suffer harm as aforesaid.

## COUNT SIX
*Civil Rights Act of 1990, R.I. Gen. Law §42-112-1 et seq.*

74. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, discriminated against Plaintiff T.J. based on her race,

causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under R.I. Gen. Law §42-112-1 *et seq.*

## COUNT SEVEN
*Common Law Abuse of Process*

75. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, misused the legal process for a wrongful purpose for which it was not intended, specifically the unlawful arrest of T.J. for the purpose of making "an example" of her.

### **Prayers for Relief**

WHEREFORE, Plaintiff hereby prays that this Court grant the following relief:

1. A declaratory judgment that the Defendants, in the manner described herein, violated the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, §§2 and 6 of the Rhode Island Constitution by violating Plaintiff's rights to be free from unreasonable seizure and to Equal Protection, and that Defendants violated the statutes and the common law of the State of Rhode Island.

2. An order establishing corresponding injunctive relief to enable Plaintiff to return to attend school in the Pawtucket public schools free from racial discrimination and deprivation of her rights under the United States and Rhode Island Constitutions and the common law.

3. An award of compensatory damages;

4. An award of punitive damages as allowed by law;

5. An award of pre- and post-judgment interest on all sums recovered, and an award of reasonable attorney's fees, expenses and costs of litigation to Plaintiff pursuant to 42 U.S.C. §1988;

6. Such other and further relief as this Court deems just and proper.

### VIII.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

### IX.   Designation of Trial Counsel

Plaintiff hereby designates Shannah Kurland, Esquire, as trial counsel.

Plaintiff, **T.J. by and through TIQUA JOHNSON,**
By her attorneys,

**Date:  June 1, 2020**

/s/ Shannah Kurland
**Shannah Kurland, Esq**.  (#9186)
149 Lenox Avenue
Providence, RI 02907
Phone:  (401) 439-0518
skurland.esq@gmail.com

/s/ Lynette Labinger
**Lynette Labinger, Esq.** (#1645)
128 Dorrance St., Box 710
Providence, RI 02903
Phone: (401)465-9565
ll@labingerlaw.com

Cooperating counsel,
American Civil Liberties Union Foundation of Rhode Island