## UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **T.J., a minor, by and through her mother** | : | |
| **and next friend TIQUA JOHNSON,** | : | |
| *Plaintiff* | : | |
| **v.** | : | |
| | : | **C.A. No. 1:20-cv-243-WES-PAS** |
| **DARREN ROSE, et al.,** | : | |
| *Defendants* | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S RULE 56(d) MOTION

## I.  INTRODUCTION

Plaintiff T.J. respectfully urges this Court to DENY Defendants' Motion for Summary Judgment (Doc. 14) as to Counts One (1), Two (2), Three (3), and Seven (7), and to GRANT Plaintiff's Motion, set forth in the appropriate affidavit form pursuant to F.R.Civ.P. 56(d), to Defer Ruling to allow time for discovery as to Counts Four (4) and Five (5).[1]  As grounds, Plaintiff cites the law and argument set forth in this Memorandum, her submission of Disputed Facts and Supplemental Undisputed Facts, the Declaration of her counsel, the Declaration of Plaintiff, and the attached exhibits.

Summary judgment is not appropriate as to Plaintiff's claims related to unreasonable seizure under the Fourth Amendment (Count 1) and Article I, section 6 of the Rhode Island Constitution (Count 2), violation of state law concerning warrantless misdemeanor arrest (Count 3), and the state tort abuse of process (Count 7).  Defendants' main argument, that Counts 1 and 2

---

[1]  As discussed below, Plaintiff is not pressing her claim for a violation of the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 *et seq.* under Count Six (6).

are collateral attacks on a conviction, and therefore barred under *Heck v Humphrey*, misapprehends the very basis of Plaintiff's claims.  T.J. argues that the *manner* in which she was arrested and charged – being escorted out of her middle school by uniformed police officers, handcuffed, and transported as a prisoner in the back of a police car – constituted excessive force, given that she was a person of tender years (13), and completely compliant and cooperative at all times after the initial incident.  Defendants' argument for summary judgment as to Count 3 fails because Rhode Island law does allow a private right of action for R.I. Gen. Laws § 12-7-3, and no other statute negates the protection afforded by that law.  Plaintiff's abuse of process claim also defeats summary judgment, because Defendants' argument that the arrest and legal process "did not become warped to serve an ulterior purpose" (MOL Doc. 14-1 at 2) ignores Defendant Rose's statements that he was arresting T.J. "to make an example of her."  (Pl. SSUF at ¶ 33).

Plaintiff relies upon Rule 56(d) as the appropriate mechanism to respond to Defendants' summary judgment motion as to Plaintiff's race-based discrimination claims under the equal protection clauses of the United States and Rhode Island constitutions (Counts 4 and 5).  Despite strong statistical evidence of pronounced racial disparities in school arrests of children punished for fighting Defendants argue that Plaintiff cannot prevail because she "provides no putative comparators and because a similarly-situated student of a different race was treated identically." (MOL, Doc. 14-1 at 8).  But the reason that Plaintiff has been unable, so far, to develop comparators—among minor children whose identity in the statistics is known only to Defendants—is due to Defendants' refusal to respond to discovery propounded by Plaintiff to investigate and develop this very information, effectively burying the data that identifies comparators at the individual level.  Defendants' selectively pointing to one white comparator but

refusing to disclose any information—sought by Plaintiff through discovery—about the entire universe of comparators does not establish that there is no fact in dispute.  It just hides the ball.

## II. FACTS

The facts are set forth in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  Here, Plaintiff has supported her objection in the Statement of Disputed Facts ("SDF"), which addresses Defendants' Statement of Undisputed Facts (Doc. 15) and her supplemental Statement of Undisputed Facts ("SSUF"), as well as the references to the record submitted therewith.

T.J. was a thirteen-year-old honor roll student at Goff Junior High School ("Goff") in Pawtucket, Rhode Island.Doc. 15 at ¶ 3, SSUF ¶41 Defendant Darren Rose, the Goff School Resource Officer ("SRO"), arrested her on school grounds for disorderly conduct, a misdemeanor, for a fight that took place out of his presence.; SSUF ¶33, 41. Defendant Rose did not witness the fight involving T.J., for which she was later arrested. SSUF ¶33.  Defendant Rose, with the assistance and cooperation of Defendant Benedetti-Ramzi, the Goff Principal, violated state law when Rose seized T.J. even though there was no indication that she was going to harm herself or others, damage property, or evade arrest. *See* R.I. Gen. Law §12-7-3.  Rose seized this child while she continued to be peaceful and fully compliant with every direction given her by adults during the more than one hour which followed a school yard scuffle of less than one minute involving T.J. and another child. SSUF ¶¶ 30, 42.  At the time Defendants Rose and Benedetti-Ramzi caused the arrest and handcuffing of T.J., the child was in the guidance office, quiet and obedient, in the presence of both defendants and her mother, Tiqua Johnson.  SSUF ¶¶ 30, 31, 33.

Before arresting T.J., Defendant Rose said twice, in Ms. Johnson's presence, that he wanted to "make an example" of T.J. SSUF ¶ 33. Ms. Johnson replied that based on her years of experience

working in a middle school, arrest was a radical and atypical response for an incident where no one was injured, and especially for a student who had never before been involved in a physical altercation. SSUF ¶ 34.  Defendant Rose said that talking with students instead of arresting them "doesn't work" and refused to consider any alternative dispositions. SSUF ¶ 35.

Defendant City of Pawtucket is well aware "that students of color ... may experience disproportionate contact with the justice system" as noted in its 2016 Memorandum of Understanding between the School and Police Departments. SSUF ¶ 43. Nonetheless, five out of seven (71%) arrests at Goff Junior High School in the 2017-2018 school year were of Black (Hispanic or non-Hispanic) children, while the student body was approximately 15% Black, non-Hispanic. SSUF ¶ 45. For the 2018-2019 school year, when Plaintiff was arrested, 56% of student arrests were of Black students. SSUF ¶ 46.  Black girls in particular have been disproportionately arrested at Goff, comprising 57% of students arrested in 2017-2018. SSUF ¶ 45.

## III.   STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Grubb v. KMS Patriots, L.P.,* 88 F.3d 1, 3 (1st Cir. 1996); *citing Kelly v. United States*, 924 F.2d 355, 357 (1st Cir. 1991); Fed.R.Civ.P. 56(c). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., supra.*. The court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251-52. In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Id.* at 250 n. 4. If the record, viewed in this light, could not lead a rational trier of fact to find for the party opposing the motion, summary judgment is proper. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. In the portion of this Memorandum supporting her Motion under Rule 56(d), Sections V and VI, *infra,* Plaintiff elaborates on the material importance of discovery responses which Defendants have refused to provide, her explanation as to good cause for not having the items in her possession, and her belief that the requested discovery is in the possession, custody, or control of Defendants.

## IV. SUMMARY JUDGMENT IS NOT APPROPRIATE.

### A. Because Plaintiff's Unreasonable Seizure and Related Claims Do Not Contradict the Outcome of the Criminal Prosecution, *Heck v. Humphrey* Does Not Apply.

Defendants' main argument in favor of summary judgment is that the decision of *Heck v. Humphrey,* 512 U.S. 477 (1994), controls and precludes relief under any of the counts asserted. "These claims, however, constitute a collateral attack on the disposition of her disorderly conduct charge, which is impermissible under the U.S. Supreme Court case of *Heck v. Humphrey.*" MOL, Doc. 14-1 at 4 (citation omitted). Respectfully, Defendants' reliance upon *Heck* is misplaced.

*Heck v. Humphrey* bars a malicious prosecution claim that is factually inconsistent with a conviction.   Here, there is no malicious prosecution claim presented.   Plaintiff's Fourth Amendment claim of unreasonable seizure *is not inconsistent with the disposition of the City's*

*criminal prosecution of T.J.* Defendants' statement that "*Heck* applies to the disposition of Plaintiff's criminal proceeding, even though she was a juvenile and elected for an alternative process to the typical Family Court proceeding" (MOL Doc.14-1. at 4) simply has no bearing here, because the disposition of the proceedings – whether criminal, Family Court, or alternative diversion program – does not apply to or negate T.J.'s claim of an *unreasonable* seizure involving excessive force. Plaintiff's Fourth Amendment claim attacks the *reasonableness* of *how* the seizure was conducted, given the totality of the circumstances; not whether or not there was probable cause for the arrest or prosecution.

Defendants further misapprehend T.J.'s claims when they aver that the disposition of the criminal charges against the youth were not "'consistent with the innocence of the accused,' a criterion generally required in order for a disposition to be considered a 'successful termination.'")). *Id.* at 5. (citing *Kennedy v. Town of Billerica*, No. 10-11457-GAO, 2014 U.S. Dist. LEXIS 6442, at *4 (D. Mass. Sept. 30, 2014) (quoting *Britton v. Maloney*, 196 F.3d 24, 31 (1st Cir. 1999)). Defendants' argument would be more relevant if this were a civil challenge to a juvenile *adjudication*. However, T.J.'s Fourth Amendment claim has nothing to do with the adjudication of the charges against her or whether there was probable cause that she committed disorderly conduct. T.J.'s claim challenges the *reasonableness* of physically seizing and handcuffing a completely compliant and obedient thirteen-year-old child, in her school in the presence of her mother and in public view, for a school yard fight that lasted a minute or less and resulted in no injuries and minimal disruption. Factoring into the totality of the circumstances is that Plaintiff had been fully compliant with every instruction given her by school officials from the time the incident ended through her being taken into custody.

Moreover, R.I. Gen. Laws §12-7-3 prohibits the arrest. This clear violation of law is grounds for an inference not merely that the arrest and handcuffing were not reasonable, but that acting contrary to statute may indicate deliberate indifference. *See e.g. Doe v. NY City Department of Social Services*, 649 F.2d 134, 146 (2d Cir. 1981) ("The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for inferring deliberate indifference from a failure to act, even without any specific knowledge of harm or risk. This is because failure to undertake a specific course of action in vindication of a general duty can reasonably be attributed to a bona fide difference of opinion as to how the duty should be performed. However, no such alternative explanation for nonfeasance can be raised where the task mandated is specific and unequivocal"); *Jensen v. Conrad*, 570 F. Supp. 114, 122 (D.S.C. 1983), *aff'd in part, appeal dismissed in part*, 747 F.2d 185 (4th Cir. 1984) ("Deliberate indifference may also be inferred from the failure of a governmental official to perform specific duties required under statute. [Citation omitted.] This inference arises from the fact that duties of governmental officials are generally defined at least in part by state or federal law. Consequently, it is natural to presume that governmental officials will familiarize themselves at least with those statutes which have a direct bearing on their official conduct.").

The inference that Defendants' actions were not reasonable is even stronger considering the guidance for SRO's set forth in the 2016 Memorandum of Understanding between the Defendant City, School Department, and Police Department. ("2016 MOU"). The MOU instructs officers working as SRO's that even when they have a warrant, they should conduct any arrests "after school hours whenever practical." SSUF ¶ 44.

**B.**     **Plaintiff's Claim Must Be Evaluated as She Pleads It, and Her Claim Addresses the Seizure, Not the Conviction.**

With their insistence on applying *Heck* and using the question of a conviction to disqualify T.J.'s claim, Defendants erect a straw man—that Plaintiff is presenting a malicious prosecution claim—which this case does not assert. "A plaintiff is the master of his own complaint, however, and so we must examine what [the plaintiff] is asking for, before we can decide whether he may pursue his section 1983 action or if the *Heck* line of cases stands in his way." *Mordi v. Zeigler*, 870 F.3d 703, 707 (7th Cir. 2017) (citing *Gilbert v. Cook*, 512 F. 3d 899, 901-02 (7th Cir. 2008). In January 2009 in Southern Illinois, a state trooper stopped Plaintiff Uche Mordi allegedly for not having his license plate properly affixed. *Id.* at 705. The trooper asked to search Mr. Mordi's car and when Mordi refused, put him in the back of the police car and summoned a K-9 unit. *Id.* at 706. The police found crack cocaine in Mr. Mordi's car, and he pleaded guilty to federal charges for possession of cocaine with intent to distribute. *Id.* Mordi filed an action under 42 U.S.C. § 1983 claiming racial profiling and prolonged detention. The district court summarily dismissed plaintiff's Fourth Amendment claims during the screening process pursuant to §1915A. On appeal, the Seventh Circuit reversed, finding that the lower court improperly ignored the inapplicability of *Heck* based on the contours of Mordi's claim, stating that "even if he were to prevail on his racial-profiling and prolonged-detention arguments, the discovery of the cocaine found within the car would be just as secure, his guilty plea would stand, and his conviction would, too. All he can hope for in his Fourth Amendment case would be some form of damages for the loss of his time and the dignitary insult inflicted by racial discrimination." *Id.* at 708.

Like Mordi, T.J. does not challenge the existence of probable cause, nor whether the outcome of the criminal charges results in a conviction or the equivalent. Rather, Plaintiff T.J.'s claim is that the *manner* in which Defendant Rose seized and handcuffed her—the seizure and handcuffing of a compliant thirteen-year-old--with Defendant Benedetti-Ramzi's full support and

cooperation – was not reasonable and therefore in violation of her rights under the Fourth

Amendment and Rhode Island Constitution Art. 1 §6.   Using handcuffs on a compliant,

cooperative child, is excessive force.   *See* Section IV.c., *infra*.

> As the Supreme Court put it in *Muhammad v. Close,* 540 U.S. 749, 751, , 124 S.Ct. 1303,
> 158 L.Ed.2d 32 (2004), "*Heck*'s requirement to resort to state litigation and federal
> habeas before § 1983 is not ... implicated by a prisoner's challenge that threatens no
> consequence for his conviction or the duration of his sentence." In addition, "when a
> defendant is convicted pursuant to his guilty plea rather than a trial, the validity of that
> conviction cannot be affected by an alleged Fourth Amendment violation because the
> conviction does not rest in any way on evidence that may have been improperly seized."

*Mordi, supra* at 707 (quoting *Haring v. Prosise*, 462 U.S. 306, 321 (1983)).   The conviction, barred

by *Heck* or not, was not the issue for Plaintiff Mordi, nor is it for T.J.   Defendants could have

obtained the same result they apparently wanted – convicting this child of a crime – without any

seizure whatsoever.   All they needed to do was to allow T.J.'s mother to bring her down to the

police station (as she pleaded) to complete the paperwork and then refer her to the Juvenile Hearing

board.   It was unreasonable and unnecessary to seize and handcuff T.J. at school.

### C.   Defendants' School Seizure and Handcuffing Arrest of Thirteen-Year Old T.J. When She Had Been Fully Compliant Was Not Objectively Reasonable.

In the discussion which follows, Plaintiff discusses the parameters of her *actual* Fourth

Amendment claim—one which is not undermined by *Heck*.   However, it is important to note that

Defendants have not actually addressed or raised this issue, and it need not be reached by the Court

in order to deny Defendants' motion for summary judgment.

The fundamental contours of the Fourth Amendment are based in reasonableness, and well-

settled principles define its shape.   "Determining whether the force used to effect a particular

seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and

quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989), (quoting

*Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotations, other citation omitted)) "The Fourth Amendment reasonableness test requires careful attention to the circumstances in the particular case." *Seekamp v. Michaud*, 109 F.3d 802, 806 (1st Cir. 1997) (citing *McCabe v. Life-Line Ambulance Serv., Inc*., 77 F. 3d 540, 546 (1st Cir.), *cert. denied*, 519 U.S. 911 (1996).

The question at the heart of Plaintiff's Fourth Amendment claim is: whether the *seizure* and handcuffing of thirteen-year-old T.J. was reasonable under the totality of the circumstances. The first fact that drives the rest of the analysis is that Defendant Rose seized T.J. at school. Already, reasonableness is framed by the simple idea that a school is not meant to be a prison:

> Although this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy. We have recently recognized that the need to maintain order in a prison is such that prisoners retain no legitimate expectations of privacy in their cells, but it goes almost without saying that "[t]he prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." *Ingraham* v. *Wright, supra*, 430 U.S., at 669, 97 S.Ct., at 1411. We are not yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment.

*New Jersey v. T. L. O*, 469 U.S. 325, 338-39 (1985). *Id.* at 341.

While *T.L.O.* addressed a school search, courts have applied its holding to school-based seizures as well, "finding seizures in the public school context to be governed by the reasonableness standard, giving special consideration to the goals and responsibilities of our public schools." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist*., 422 F.3d 141, 148 (3d Cir. 2005). *See also C.B. v. City of Sonora*, 769 F.3d 1005, 1023 (9th Cir. 2014) (en banc), *cert. denied,* 574 U.S. 1159 (2015) (citing *Doe ex rel. Doe v. Haw. Dep't of Educ.,* 334 F.3d 906, 909 (9th Cir.2003)). *See also Wallace ex rel. Wallace v. Batavia Sch. Dist. 101,* 68 F.3d 1010, 1013-14 (7th Cir.1995); *Hassan ex rel. Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1079-80 (5th Cir.1995); *Edwards ex rel. Edwards v. Rees,* 883 F.2d 882, 884 (10th Cir.1989).

*C.B. v Sonora* involved an eleven-year-old sixth grader who was sitting quietly but not responding to orders from his teacher.  There, the Ninth Circuit denied qualified immunity when police handcuffed C.B., put him in the back of a police car, and drove the child thirty minutes away to his uncle's place of work, finding it clearly established law that defendants' actions did not meet the standard for reasonableness under Fourth Amendment standards.

> It is beyond dispute that handcuffing a small, calm child who is surrounded by numerous adults, who complies with all of the officers' instructions, and who is, by an officer's own account, unlikely to flee, was completely unnecessary and excessively intrusive. Moreover, none of the *Graham* factors even remotely justified keeping C.B. handcuffed for approximately thirty minutes in the back seat of a safety-locked vehicle.

*Id.*, at 1030-31.  The court analyzed whether *T.L.O.* or *Graham* applied to C.B.'s excessive force claim – handcuffing the child as he was driven around in the police car – and determined that the "use of handcuffs on a calm, compliant, but nonresponsive 11–year–old child was unreasonable under either standard." *Id.* at 1030.  On the open question of whether to generally apply a reasonableness standard or that of *Graham* to an excessive force claim, the court drew a line at the schoolhouse door: "In no event, however, do we think that an officer could have reasonably believed that *T.L.O.* governs police use of force once a student is in police custody and outside the confines of the school setting, as C.B. was throughout the commute to his uncle's place of business." *Id.* at 1029-30.

In a recent case addressing handcuffing of an adult, this Court analyzed the claim of excessive force using the *Graham* factors as set forth by the First Circuit.  "For a claim of excessive force via handcuffing, 'a plaintiff must establish that the defendant's actions in handcuffing [the plaintiff] were objectively unreasonable in light of the circumstances and the facts known to the officer at the time.'" *Channing v. Town of S. Kingstown*, C.A. No. 18-004 WES, 2021 WL 2533874, at *3  (D.R.I. June 21, 2021). (citing *Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir.

2006) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989))).  In the context of a motion for summary judgment,[2] the Court determined that a reasonable jury could infer that the defendant officer used excessive force and caused the plaintiff injury.  In its Memorandum and Order, this Court referenced the First Circuit's application of *Graham*: "Application of the reasonableness test 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* at *4 (citing *O'Brien v. Town of Bellingham*, 943 F.3d 514, 531 (1st Cir. 2019) (quoting *Graham*, 490 U.S. at 396)).

Whether applying *T.L.O.* or *Graham* to police seizures, school seizure and arrest cases generally consider age, the nature of the misbehavior, and the child's demeanor at the time as indicia of reasonableness.  The Fourth Circuit found the handcuffing of a ten-year-old student to be an unreasonable use of force where E.W. had kicked and hit another girl on the school bus three days previously.  *E.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018) ("we have a calm, compliant ten-year-old being handcuffed on school grounds because she hit another student during a fight several days prior. These considerations, evaluated under the *Graham* framework, demonstrate that Dolgos's decision to handcuff E.W. was unreasonable.").

Analyzing the second *Graham* factor, whether the subject poses an immediate threat to the officer or others, the Fourth Circuit found that the child did not present a threat at the time of her arrest.

> Dolgos could not have reasonably believed that E.W. presented any immediate risk of harm to anyone. Like the adult suspect in *Solomon* , E.W. had no weapons and made no threats, *see* 389 F.3d at 174, and like the eleven-year-old in *Sonora* , she was calm and

---

[2]   In *Channing,* the Court was presented with a motion for summary judgment based upon qualified immunity.  Defendants have not grounded their motion on that basis and it is therefore not addressed here.

> compliant as Dolgos spoke to her, *see* 769 F.3d at 1030. In fact, Dolgos recognized that E.W. appeared calm. *See* J.A. 23–24. Also similar to the suspects in *Solomon* and *Sonora* , E.W., at 4'4" and ninety-five pounds, was quite small relative to Dolgos, the arresting officer, who was a foot taller and sixty pounds heavier. *See Sonora*, 769 F.3d at 1030; *Solomon*, 389 F.3d at 174. Not to mention, E.W. was in a closed office and surrounded by two school administrators and a deputy sheriff. Given these facts, E.W. posed little threat even if she were to become aggressive.

*E.W. v. Dolgos*, 884 F.3d 172, 181 (4th Cir. 2018) (citing *Sonora* , 769 F.3d at 1030; *Solomon v. Auburn Hills Police Dept*, 389 F.3d 167, 174 (6th Cir. 2004)).  The circumstances that the Fourth Circuit took into account are remarkably similar to those known to Defendants Rose and Benedetti-Ramzi at the time they caused T.J. to be arrested.  T.J. was also calm and compliant at the time she was arrested.  SSUF ¶ 30.   Like E.W., T.J. was in a closed office with a school administrator and a police officer.  SSUF ¶¶ 30, 31, 33. Moreover, T.J.'s mother was present when Defendant Rose arrested T.J. and had even proposed driving her daughter to the police station herself as an alternative to arresting the child. SSUF ¶¶ 37.

The Eleventh Circuit has used the same factors to reach a similar conclusion and also considers the officer's motivation when arresting a child as evidence that there was no threat to safety in play.  Laquarius Gray was nine years old when she allegedly made a threat of physical violence toward her gym teacher ("I'll bust you in the head" or words to that effect).  *Gray ex Rel. Alexander v. Bostic*, 458 F.3d 1295, 1300 (11th Cir. 2006).  The school resource officer on duty saw the exchange and put handcuffs on the girl, extra tight, in order to "to help persuade her to rid herself of her disrespectful attitude." *Id.* at 1301-02.   The Eleventh Circuit analyzed whether "the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Gray, supra* at 1305 (quoting *T.L.O.* at 342).  As the court pointed out, "[t]he problem in this case for Deputy Bostic is that, at the time Deputy Bostic handcuffed Gray, there was no indication of a potential

threat to anyone's safety. The incident was over, and Gray, after making the [allegedly threatening] comment, had promptly complied with her teachers' instructions." *Id.* at 1306.

Like T.J., from the moment the incident was over, "Gray had cooperated with her teachers and did not pose a threat to anyone's safety." *Id.* The motivation for handcuffing Gray was important to the Eleventh Circuit's conclusion that Deputy Bostic *did* violate Laquarius Gray's Fourth Amendment rights:

> Deputy Bostic does not even claim that he handcuffed Gray to protect his or anyone's safety. Rather, Deputy Bostic candidly admitted that he handcuffed Gray to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes. In effect, Deputy Bostic's handcuffing of Gray was his attempt to punish Gray in order to change her behavior in the future.

> Thus, Deputy Bostic's handcuffing Gray was not reasonably related to the scope of the circumstances that justified the initial investigatory stop. Rather, the handcuffing was excessively intrusive given Gray's young age and the fact that it was not done to protect anyone's safety. Therefore, the handcuffing of Gray violated Gray's Fourth Amendment rights.

*Id.* Defendant Rose, with Defendant Benedetti-Ramzi's full consent and cooperation, seized and arrested T.J. "to make an example" of her, and not for any reason having to do with safety. SSUF at ¶33. She had been compliant and posed no threat to anyone. *Id.* at ¶ 30. Defendant Rose violated T.J.'s Fourth Amendment rights, just as Deputy Bostic did to Plaintiff Gray.

Even where the arrest and handcuffing happens outside of a school in a potentially more dangerous context, courts take the child's age into account, as the Ninth Circuit did when federal agents executing a search warrant handcuffed an eleven-year old boy who happened to be taking out the garbage at the time of the raid on his home. *Tekle v. U.S.*, 511 F.3d 839, 846 (9th Cir. 2006) ("Under these circumstances, even if the officers needed to secure Tekle in order to execute the search and arrest warrants, it should have been apparent that this eleven-year-old boy did not pose a threat and that the need for force accordingly was minimal. [citing *Meredith v. Erath*, 342

F.3d 1057, 1061 (9th Cir. 2003)] (finding the force excessive where the officer threw the plaintiff to the ground and handcuffed her, despite the fact that she posed no safety risk and made no attempt to leave the property); *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir. 2005) (stating that the governmental interests in using handcuffs were at a minimum when there was no indication that officers believed the suspects would flee or be armed), *cert. denied*, 546 U.S. 1170, 126 S.Ct. 1331, 164 L.Ed.2d 48 (2006)")

School arrests or detentions that have been upheld as reasonable have involved a smaller invasion of privacy and infringement of the student's Fourth Amendment rights than what T.J. experienced, such as the plaintiff in *Bravo ex rel. Ramirez v. Hsu*, 404 F. Supp. 2d 1195, 1203-04 (C.D. Cal 2005).   Eighth grade student Jennyfer Bravo was required to stay in the principal's office for three hours after school officials investigated and determined that she had possessed and shown to another student a white powdery substance in a plastic bag and that she had said it contained "drugs."

> The detention of Jennyfer in Principal Aguilar's office was also reasonable in scope. Plaintiffs do not allege that school officials forced Jennyfer to remain in the office except during the period between the other students' reports and the time Jennyfer's mother arrived. She was detained only as long as was necessary to question her and keep her safe and out of class until school officials could confer with her and her mother. Jennyfer was never handcuffed or physically restrained, nor was she subjected to any verbal abuse or mistreatment.

*Id.*  The seizure of T.J., like the seizure of the plaintiff in *Bravo,* started with being detained in the principal's office.  For T.J., however, the intensity of the seizure increased exponentially, as she was taken out of school by armed police officers and then handcuffed and brought to the police station as a prisoner in the back of a police car.  SSUF at ¶¶ 40.

More significantly, Defendants do not even address this issue, instead asserting that the rationale of *Heck* precludes further review.  Not once in their eighteen-page Memorandum do

Defendants respond to Plaintiff's *actual* claim – that by causing her to be taken into physical custody and handcuffed, they violated her right to be free from unreasonable seizure and excessive force. [3]

**D.  Plaintiff's State Claims are Not Barred by *Heck*.**

Defendants do not specifically argue that *Heck* applies to state law claims and there is strong reason to conclude, as discussed below, that it does not.  In any event, the analysis is the same:  *Heck* is inapposite.  As Defendants point out, "[a]ll three of Plaintiff's state-law claims in this matter implicate the same issues as her claims under § 1983."  Doc. 14-1 at 8.  None of the actual claims presented by Plaintiff--the unreasonable manner in which defendants seized T.J. nor the fact that she was the victim of race-based discrimination--undermine her juvenile conviction, and, therefore, do not implicate *Heck*.

**E.  Plaintiff has a cognizable claim for violation of R.I.G.L. Section 12-7-3.**

**1.    <u>The Right to Be Free From a Warrantless Arrest for a Misdemeanor *Did* Exist at Common Law, Contrary to Defendants' Assertion.</u>**

Defendants claim that Count 3 fails on the basis that a violation of R.I. Gen. Laws §12-7-3 does not support a private cause of action.  Their argument is expressly premised on the statement that "[n]o right to be free from a warrantless arrest for a misdemeanor existed at common law" (Doc. 14-1 at 11).  That premise is incorrect. Rhode Island General Law §12-7-3, Arrest without warrant for a misdemeanor or petty misdemeanor derives from common law and the Rhode Island Supreme Court has recognized a cause of action based upon its violation.  Section 12-7-3, itself

---

[3]    Arresting schoolchildren appears to be an important dividing line not only for the judiciary, but for at least one legislative body as well. Perhaps due to increased societal understanding of youth brain development New York State has recognized the inherent unreasonableness of arresting children at all, let alone in school.  The state recently enacted legislation to outlaw the arrest of children younger than twelve in nearly all circumstances. 2021-2022 Legislative Session Senate Bill S4051A, https://www.nysenate.gov/legislation/bills/2021/s4051.

derived from Public Law 1915, ch. 1261,[4] is based upon Rhode Island common law.  The Rhode Island Supreme Court stated unequivocally more than eighty years ago that at common law, "an officer had no authority… to arrest without a warrant" for a misdemeanor unless it was committed in his presence:

> Prior to the enactment of this section, the common law governed the scope of an officer's authority in this state, to arrest without a warrant and to detain the arrested person in custody. That law permitted an officer to arrest without a warrant on reasonable suspicion based on his own knowledge that a felony had been committed or upon information from some "creditable person". *Wills* v. *Jordan,* 20 R.I.630.  In all other cases, except in the case of a misdemeanor amounting to a breach of the peace committed in his presence, an officer had no authority, at common law, to arrest without a warrant.

*Kominsky v. Durand*, 64 R.I. 387, 392 (R.I. 1940).

Applying *Kominsky* in *Gantz v. Hames,* 337 A.2d 234 (R.I. 1975), the Rhode Island Supreme Court affirmed a verdict for false arrest for violation of §12-7-3, based upon the warrantless arrest of the plaintiff, notwithstanding that plaintiff had admitted to a battery of a transit employee  outside of the arresting officer's presence, under circumstances that did not support a viable basis to believe that the individual would flee or could not be arrested later.

In *Dyson v. City of Pawtucket*, the Rhode Island Supreme Court made it clear that probable cause does *not* defeat a claim for false arrest.

> *We disagree with the defendant officers' contentions and decline to extend the rule for malicious prosecution to bar Dyson's claim of false arrest*. "Guilt or innocence of the underlying charge * * * is not relevant to the determination of whether the arresting officer committed a false imprisonment." In the instant case Rousseau provoked Dyson's disorderly behavior when he arrested her without probable cause as she was attempting to make a phone call. He cannot now be allowed to use her subsequent conviction on the charge of disorderly conduct to avoid liability for false arrest.

---

[4] "This section became a part of the statute law for the first time in 1915. In that year G.L. 1909, chap. 354, entitled "Of Proceedings in Criminal Cases", was amended in its entirety and six new sections added thereto by P.L.1915, chap. 1261, among which was the section under consideration." *Kominsky v. Durand*, 64 R.I. 387, 392 (R.I. 1940).

670 A.2d 233, 239 (R.I. 1996). Plaintiff Dyson was arrested after being ordered out of a car in which she was a passenger and walking down the street with her sister to a phone booth to complain to a supervisor about Defendant (police officer) Rousseau's use of vulgar language. *Id.* at 235. Dyson alleged that Rousseau smacked her head against the police car several times. *Id.* Defendants had argued that because Dyson was found guilty of Disorderly Conduct after trial in District Court, her false arrest claim must fail.[5] It was defendants' argument that failed in the end.

   2.   <u>**Rhode Island Law Does Not Prohibit a Right of Action on Statutory Rights, Especially Where Plaintiff Seeks Non-Monetary Damages.**</u>

   Defendants' analysis overstates the prohibition on a private right of action and ignores circumstances where a Plaintiff may sue under a statute whether or not the language explicitly provides for a private right of action. Defendants misconstrue the holding in *Bandoni v. State*, 715 A.2d 580, 584 (R.I. 1998) ("The Bandonis contend that defendants' inexcusable failure to comply with these duties constitutes a breach requiring *monetary damages* to compensate them for their injuries.") (emphasis added). After an exhaustive analysis of whether the Plaintiffs had waived any request for injunctive relief in their (boilerplate) pleading, the majority determined that they were "quite comfortable with our conclusion that the only issue before this Court is the question of a viable claim for monetary damages." *Id.* at 598. Here, Plaintiff has a total of seven (7) claims and her prayer for relief, Doc. 1 at 14-15, lists declaratory relief first, followed by injunctive relief that is most certainly non-boilerplate, with compensatory and punitive damages listed third and fourth. Thus, whether or not she pursues monetary or injunctive relief for other claims, her claim under §12-7-3 for warrantless misdemeanor arrest in contravention of the law may be considered a claim

---

[5] Rhode Island Judiciary records indicate that Dyson appealed the District Court result to Superior Court, P3-1984-0945A, and that the matter was filed with a plea of *nolo contendere*.

for injunctive and/or declaratory relief, and thus is viable whether or not the statute includes specific language authorizing a cause of action.

### 3.   An Unrelated Statute Does Not Negate the Rights Established By the Statute Limiting Warrantless Arrest for Misdemeanors.

Defendants argue that a statute from Title 14 of the Rhode Island General Laws, governing "Delinquent and Dependent Children" § 14-1-25, somehow overrides the clear language of the statute limiting police arrest powers generally, codified at §12-7-3.  However, the statute on which Defendants rely must be interpreted in terms of its legislative purpose, which is clearly stated at §14-1-2:

> (1) To secure for each child under its jurisdiction the care, guidance, and control, preferably in his or her own home, that will serve the child's welfare and the best interests of the state;

> (2) To conserve and strengthen the child's family ties wherever possible, *removing him or her from the custody of his or her parents only when his or her welfare or the safety and protection of the public cannot be adequately safeguarded without that removal*[.]

(emphasis added). Given that the statutes in question relate to criminal law, the Rhode Island Supreme Court has instructed how to approach any perceived inconsistencies: "[W]hen the meaning of a criminal statute is ambiguous, the policy of leniency in construction of criminal statutes requires that the less harsh of two possible meanings be adopted." *State v. Jordan*, 528 A.2d 731, 735 (1987) (citing *State v. Anthony,* 422 A.2d 921 (R.I. 1980)).

### F.   Plaintiff's Claim for Abuse of Process Is Valid Because Defendant Rose Made Multiple Comments Evidencing His Wrongful Purpose in Arresting T.J.

Defendants state Rhode Island law correctly that for an Abuse of Process claim "a plaintiff must show "'(1) that the defendant instituted proceedings or process against the plaintiff and (2) that the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish.'" Doc. 14-1 at 17 (citing *Fiorenzano v. Lima*, 982 A.2d 585, 590 (R.I. 2009) (quoting *Palazzo v. Alves*, 944 A.2d 144, 154 (R.I. 2008))). They are correct that "the

plaintiff must show that 'a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed.'" (citing *Fiorenzano*, 982 A.2d at 590 (quoting *Hillside Assocs. v. Stravato*, 642 A.2d 664, 667 (R.I. 1994)).

By trying to "make an example" of T.J. as he told her mother (SSUF ¶ 33) Rose and his co-Defendant went beyond the limits of a reasonable seizure and committed Abuse of Process under the common law of the State of Rhode Island. To recognize the extent to which such motivation of "making an example" of a youth is a perverted reason to arrest her, one need only look to the Pawtucket Police Department policy regarding the handling of juveniles under their jurisdiction. "It is the policy of the Pawtucket Police Department to use the least coercive, most reasonable alternatives when dealing with juveniles, consistent with state law, city ordinance, and the safety and security interests of this City." SSUF ¶ 44. Here, Defendant Rose's desire to "make an example" of T.J. violated state law and was contrary to the safety and security interests of the City of Pawtucket and its residents, including T.J., her classmates, and her family.

## V. STANDARD GOVERNING A RULE 56(d) MOTION TO DEFER

"Federal Rule of Civil Procedure 56(d) supplies a ready mechanism for a party to obtain more time to gather facts necessary to oppose a motion for summary judgment." *Nieves-Romero v. United States*, 715 F.3d 375, 381 (1st Cir. 2013) (footnote omitted, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986) (explaining that "[a]ny potential problem with [a] premature [motion for summary judgment] can be adequately dealt with under [this rule]")). Rule 56(d) "provides, in relevant part, that if a party opposing summary judgment shows that 'for specified reasons, [he] cannot present facts essential to justify [his] opposition,' the district court may grant appropriate relief." *Nieves-Romera,* 715 F.3d at 381 (quoting Fed. R. Civ. P. 56(d)).

Rule 56(d) serves a valuable purpose. It protects a litigant who justifiably needs additional time to respond in an effective manner to a summary judgment motion. It provides a safety valve for claimants genuinely in need of further time to marshal facts, essential to justify [their] opposition ... to a summary judgment motion.

*In re PHC, Inc. Shareholder Litigation*, 762 F.3d 138, 143 (1st Cir. 2014) (internal quotations, citations omitted).

Put another way, "Rule 56(d) serves a valuable purpose. It protects a litigant who justifiably needs additional time to respond in an effective manner to a summary judgment motion. *See Vargas–Ruiz v. Golden Arch Dev., Inc.,* 368 F.3d 1, 3 (1st Cir.2004). Such a need may arise because, say, a party has not had a fair opportunity to conduct necessary discovery. *See Vélez,* 375 F.3d at 39." *Rivera Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28 (1st Cir. 2013).

"In order to gain the benefit of Rule 56(d), the party opposing summary judgment must make a sufficient proffer: 'the proffer should be authoritative; it should be advanced in a timely manner; and it should explain why the party is unable currently to adduce the facts essential to opposing summary judgment.'" *In re PHC, Inc. Shareholder Litigation*, 762 F.3d at 143 (quoting *Resolution Trust Corp. v. N. Bridge Assocs., Inc*., 22 F.3d 1198, 1203 (1st Cir. 1994)).

Citing *Resolution Trust, supra,* and writing for a panel of the First Circuit Court of Appeals, Chief Judge McConnell explained the requirements for satisfying Rule 56(d):

If the reason the party cannot "adduce the facts essential to opposing summary judgment" is incomplete discovery, the party's explanation (i.e., the third requirement) should: (i) "show good cause for the failure to have discovered the facts sooner"; (ii) "set forth a plausible basis for believing that specific facts ... probably exist"; and (iii) "indicate how the emergent facts ... will influence the outcome of the pending summary judgment motion." *Id.* Thus, in a case involving incomplete discovery, the Rule 56(d) proffer requirements can be categorized as: "authoritativeness, timeliness, good cause, utility, and materiality." *Id.* "[T]hese requirements are not inflexible and.... one or more of the requirements may be relaxed, or even excused, to address the exigencies of a given case." *Id.*

*In re PHC, Inc. Shareholder Litigation., supra*, 762 F.3d at 143-144.

"Consistent with the salutary purposes underlying Rule 56[d], district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter." *In re PHC, Inc. Shareholder Litigation., supra*, 762 F.3d at 143, quoting *Resolution Trust Corp., supra*, 22 F.3d at 1203 (footnote omitted).

Authoritativeness and timeliness are generally fulfilled through a properly executed and filed affidavit documenting the reasons why the movant needs additional discovery. The timeliness requirement is easily met: "Although a party does not necessarily need to file a Rule 56(d) affidavit at the time he responds to the summary judgment motion, the party must file the affidavit at some time before the court passes on the motion." *Morrison v. Yum! Brands, Inc.*, 53 F. Supp. 3d 437, 440 (D. Mass. 2014) (citing *Nieves–Romero, supra*, 715 F.3d at 381).

## VI.    ARGUMENT IN SUPPORT OF PLAINTIFF'S RULE 56(d) MOTION

In the case at bar, Plaintiff's proffer meets all five requirements of Rule 56(d). The Declaration of lead counsel Shannah Kurland demonstrates authoritativeness, timeliness, good cause, utility, and materiality. ("Aff. Kurland"). *See In re PHC, Inc. Shareholder Litigation,* 762 F.3d at 144 ("There is no question that plaintiffs have satisfied the first two requirements, 'authoritativeness' and 'timeliness.' Plaintiffs promptly invoked Rule 56 shortly after defendants moved for summary judgment, and they did so by filing an authoritative affidavit."). The issue of timeliness is similarly easily dealt with. Plaintiff immediately moved for an extension in order to adequately respond to the Defendants' Motion. Stipulation, Doc. 18, Asst. Mot. Ext. Time, Doc. 20. Plaintiff diligently and timely sought to develop the record through discovery on the Defendants. Aff. Kurland ¶¶ 2-4. At a discovery conference concerning Plaintiff's effort to compel additional information, the Court accepted Defendants' representation that Defendants had a legal

issue that would resolve everything and determined that the issue should be presented first, recognizing that, if it did not, Plaintiff would be pressing for the discovery that she has not been able to secure. Aff. Kurland ¶ 9.

### A.   Defendants' Failure to Comply With Their Discovery Obligations Is Good Cause for Plaintiff's Failure to Have the Necessary Facts Sooner.

Defendants claim that Plaintiff's Equal Protection claim fails for lack of a comparator, yet they have refused to comply with discovery obligations that would fill in the missing details on potential comparators that Plaintiff has identified in the abstract, through public records, and the portion of discovery provided to date. Aff. Kurland, ¶ 10 (c),(g),(i),(j), (k).  The lack of discovery is significant. *In re PHC, Inc. Shareholder Litigation*, 762 F.3d at 144 ("Typically, when the parties have no opportunity for discovery, denying the Rule 56[d] motion and ruling on a summary judgment motion is likely to be an abuse of discretion.") (quoting *CenTra, Inc. v. Estrin*, 538 F. 3d 402, 420 (6th Cir.2008).  Like the defendants here, the defendants in *In re PHC, Inc. Shareholder Litigation* averred that none of plaintiff's claims were viable. *Id.* at 142.

Plaintiff's affidavit from counsel details Plaintiff's efforts to obtain discovery on Counts 4, 5, (and 6), and Defendants' refusal and failure to comply with the requests.   A March 10, 2021 letter from Plaintiff to Defendants, attached to the Affidavit as Exhibit 9, describes Plaintiff's significant concerns with Defendant Benedetti-Ramzi's responses to interrogatories.  In the letter, Plaintiff identified problems including boilerplate objections and a failure to respond directly and completely to several of the interrogatories or requests posed.  Aff. Kurland ¶ 5.  T.J. faces a similar challenge as did plaintiffs in *In re PHC, Inc. Shareholder Litigation.*

> The Rule 56 Affidavit establishes plaintiffs' persistence in their pursuit of discovery at an early stage of the litigation…. We are mindful that a party seeking "discovery expeditiously is not obligated to take heroic measures to enforce his rights against a recalcitrant opponent."

762 F.3d at 144 (citing *Carmona v. Toledo,* 215 F.3d 124, 135 (1st Cir.2000) (citation omitted) (internal quotation marks omitted)). "Much of the information sought was within defendants' control, 'a factor which weighs heavily in favor of relief under Rule 56([d]).'" *In re PHC, Inc. Shareholder Litigation* 762 F.3d at 144  (quoting *Reid v. New Hampshire*, 56 F.3d 332, 342 (1st Cir. 1995)).

    **B.**    **Preliminary Analysis Shows an Undeniable Patterns of Racial Disparities and Indicates that Further Discovery Will Reveal Comparators From Facts In Defendants' Possession.**

"Utility" in this context can be defined as "a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time." *In re PHC, Inc. Shareholder Litigation*  762 F.3d at 144  (quoting *Rivera-Torres v. Rey-Hernández*, 502 F.3d 7, 10 (1st Cir. 2007)). In their Motion for Summary Judgment, Defendants aver that "Plaintiff has not presented any similarly situated persons at all, let alone any such persons who were treated differently from her." MOL Doc. 14-1 at 10.  The raw data that Plaintiff has gathered from public records, supplemented by the documents that Defendants have provided through discovery, indicate a strong likelihood that appropriate comparators exist, and that Defendants have comparator information in their possession that they have refused to provide it.[6]  *See generally*, Aff. Kurland.

Mathematically, it is beyond dispute that Black students are arrested at Goff Middle School at significantly higher rates than white students.  Aff. Kurland at ¶¶ 13, 14.  The data available to date also shows that as the consequences become more severe for students for infractions related to fighting, the disparate rate at which Black students are prosecuted grows even more marked.  *Id.* at ¶ 15.

---

[6]  Indeed, information concerning the one comparator that Defendants *have* provided was not produced during discovery, and only produced when Defendants filed it in support of their Motion.

Exhibit 10 submitted with Plaintiff's Affidavit from Counsel in support of the Motion to Defer is an Enrollment Census Report from the Rhode Island Department of Education providing data on suspensions at Goff for the 2017-18 and 2018-19 school years, disaggregated by race. *Id.* at ¶ 17.  Exhibit 11 is a grid listing thirty-nine (39) incidents from the 2018-19 school year, with columns for location, classification as "major" or "minor" consequence, and a brief description of the incident.  Each incident uses initials to identify one or more students.  Only the June 3, 2019 altercation (presumably involving T.J. and M.P.) records "arrest" among the consequences.  Other incidents deemed "major" as well as "minor" note conduct including pushing, hitting, slapping, fighting, hitting a student "in frustration," and "swinging at each other"—that is, the same type and apparent severity as that on the video – did not result in arrest or even law enforcement referral. Plaintiff should be allowed to determine whether one or more of those students who were *not* arrested are similarly situated comparator(s).  Central to this inquiry – what is the *race* of the students who were not arrested?  Review of the individual records, including who classified the incidents, who determined whether to refer to police, and the decision-making process they used could also reveal facts leading to a reasonable inference of discriminatory intent on the part of one or more defendants.

Defendants do not deny that such information exists or is in their possession.  To the contrary, after providing objections and non-responses in discovery, Defendants selectively point to one comparator—the other participant in the scuffle with Plaintiff.  Plaintiff's Interrogatories number 14 and 15 to Defendant Benedetti-Ramzi ask for the number of students, identified by gender and race, who have been arrested related to incidents at school, and who have been disciplined for engaging in fighting, including the subset of those students who have also been arrested during the defendant's tenure at Goff.  *See* Exhibit 3 (SDF).  Defendants refused to

respond.  Defendant Benedetti-Ramzi responded with an objection: "Any such information is protected from discovery by the work-product privilege and was created in anticipation of litigation." Any suggestion that records offering a demographic profile of student arrests were only kept "in anticipation of litigation" is ludicrous.  One need look only at the data provided by the Defendants to the United States Department of Education, Office of Civil Rights posted online, which details information, including details by school (such as Goff), discipline and race and ethnic characteristics as far back of 2017—that is, two years before Plaintiff got into a schoolyard scuffle with another student.[7]  Pawtucket is required to compile data by the RI Department of Education.  It also provided data to the ACLU of Rhode Island in response to an Access to Public Records Act request.  Aff. Kurland ¶ 19.

Defendants' motion is grounded on the asserted failure of Plaintiff to offer up any "comparator" evidence after withholding all data from which Plaintiff could develop such evidence.  Plaintiff has been diligent and focused in her efforts to obtain and review the data and has been stymied by the Defendants, who represented to the Court that it would not be relevant *because* the *Heck* decision precluded any relief. As discussed above, *Heck* does not preclude relief. Plaintiff should be permitted to develop her case.

> In a matter like this, when "plaintiffs' case turns so largely on their ability to secure evidence within the possession of defendants, courts should not render summary judgment because of gaps in a plaintiff's proof without first determining that plaintiff has had a fair chance to obtain necessary and available evidence from the other party." To rule otherwise would encourage defendants "to 'stonewall' during discovery— withholding or covering up key information that is otherwise available to them through the exercise of reasonable diligence." *Id.*

*In re PHC, Inc. Shareholder Litigation* 762 F.3d at 145 (quoting *Carmona*, 215 F.3d at 133) (internal citation omitted).

---

[7]   *See, e.g.,*  https://ocrdata.ed.gov/profile/9/school/270315/summary?report=true, last viewed 3.14.22.

C.     **Plaintiff Seeks Facts to Explain the Overwhelming Patterns of Racial Disparity Through the Individual Stories Needed to Reveal Comparators.**

The information Plaintiff seeks easily meets the "'necessarily low' 'threshold of materiality.'" *Bobbett v. City of Portsmouth*, No. 17-CV-265-SM, 2018 WL 3079705, at *2 (D.N.H. June 21, 2018) (quoting *Animal Hosp. of Nashua*, 2012 WL 3956705, at *1 (quoting *Resolution Trust* 22 F.3d at 1207). Were Defendants to provide the information requested in written discovery, including the materials described in Counsel's Affidavit at ¶ 11(c), (j), and (k),[8] Plaintiff could, on her own or with the assistance of an expert witness, analyze the factors and circumstances behind the facial racial disparity in school discipline and arrest patterns at Goff. *See e.g. Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003) ("In general, the absence of an overtly discriminatory policy or of direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population." (citing *Chavez v. Illinois State Police,* 251 F.3d 612, 626 (7th Cir.2001))

Defendants' reliance upon records relating to M.P., the other girl in the fight with T.J., as a comparator is another clear example of why the Court should grant Plaintiff's Motion to allow further discovery. Plaintiff respectfully submits that records relating to M.P. should have been produced both in "initial disclosure"—when the comparable records of Plaintiff T.J. were produced and were also required (if not earlier provided) in response to Plaintiff's request for all documents relating to the events at issue. The fact that Defendants have *now* included such records

---

[8]   Paragraph 11(c) of Counsel's affidavit describes "The number of students, identified by gender and race, who have been arrested related to incidents at school and who have been disciplined for engaging in fighting, including the subset of those students who have also been arrested during Defendant Benedetti-Ramzi's tenure at Goff, and the numbers arrested by Defendant Rose." Paragraphs 11(j) and (k) reference metadata and documents concerning the details of school arrests at Goff and are designed to identify data relating to school disciplines not resulting in arrest for comparable behavior.

in support of their Motion for Summary Judgment underscores their relevance.  Yet they were never produced, nor specifically identified as being withheld in a privilege log or otherwise. Frankly, this is disturbing.

Defendants have that information which they failed to provide before filing their instant motion.  When it suited their purposes—in supporting a motion for summary judgment—they provided it selectively as to one comparator, but they have refused to enable Plaintiff to review the information as to the entire universe of comparators.  That group is small, but it is more than one. We know that it is substantially more than these two individuals and that it is disproportionately minorities who feel the brunt of discipline and prosecution from the public data that Defendants have provided.  But that's as much—since discovery has so far been denied—as Plaintiff has been able to obtain.  Plaintiff's comparators are juveniles; their names or other identifiers, much less contact information, are not available.  Without discovery, Plaintiff has no avenue to learn about the circumstances surrounding discipline and arrest – or lack thereof – of other white and non-white students with fighting-related infractions.  Still, the mathematical reality demands a deeper explanation.  Defendants should not be permitted to benefit from their failure to comply with discovery.

In assessing facial plausibility of a claim, the First Circuit has explained that "'some latitude' may be appropriate where a plausible claim may be indicated 'based on what is known,' at least where, '*some of the information needed may be in the control of [the] defendants*." *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012) (emphasis added), quoting *Pruell v. Caritas Christi,* 678 F.3d 10, 15 (1st Cir. 2012), *cert. denied,* 566 U.S. 962 (2012).

**D.**   **Plaintiff's Equal Protection Claim is Not Barred by *Heck v. Humphrey* and Should Proceed to Discovery.**

Defendants may assert that Plaintiff's Motion is futile, as they extend their flawed *Heck* analysis (*supra* at IV.A) to Plaintiff's Equal Protection claim.  Defendants contend that "a finding in Plaintiff's favor on her equal protection claim would serve to invalidate the disposition of her criminal matter" and cite one Third Circuit case to support their position.  MOL Doc. 14-1 at 7 (citing *Gibson v. Superintendent of New Jersey Department of Law & Public Safety-Division of State Police*, 411 F.3d 427, 440-441 (3d Cir. 2005)).  In *Gibson*, the Plaintiff sought redress for claims under the Fourth and Fourteenth Amendment for a drug conviction stemming from the (now) widely known practice of racial profiling by New Jersey state police.  The appellate court's holding was specific to Plaintiff Gibson's claim, where the entire basis of his conviction stemmed from the discriminatory traffic stop, and it addressed the question of deferred accrual under *Heck*. *Id.* at 441 ("Because a successful claim of selective enforcement under the Fourteenth Amendment Equal Protection Clause would have necessarily invalidated Gibson's conviction, under the *Heck* deferred accrual rule the statute of limitations did not begin to run until his sentence was vacated and this claim is not untimely.)

This analysis is case specific, however, and does not preclude every equal protection claim under *Heck*.  In *Brown v. Gorman*, No. CV 07-026-BLG-RFC-CSO, 2008 WL 2233497, at *4 (D. Mont. Apr. 29, 2008), *adopted,* 2008 WL 2233497 (D. Mont. May 27, 2008), decided after *Gibson,* the district court concluded that *Heck* did not apply because Plaintiff Brown was not seeking to undermine or vacate the conviction (a speeding ticket) but rather being subjected to racial profiling. "Plaintiff alleges that he was racially profiled because as an African American he was stopped for speeding by Defendant Gorman while white motorists traveling at speeds in excess of the speed limit were not stopped. This is sufficient to state a claim for denial of equal protection on the basis

of race.  Plaintiff is not challenging his conviction, and his racial discrimination claim, if successful, would not necessarily imply the invalidity of his underlying conviction. Accordingly, Plaintiff's claims are not barred by *Heck*[.]"

The Tenth Circuit has taken a similar position in overturning a trial court's decision to bar Plaintiff's Equal Protection claim because there was probable cause for the traffic stop.  "That Mr. Marshall's stop and arrest were based on probable cause does not resolve his more troubling claim that he was targeted by Officer Porter on account of his race." *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1166 (10th Cir. 2003).  *See also Webb v. City of Waterloo*, No. 17-CV-2001-CJW-MAR, 2019 WL 6736219, at *15 (N.D. Iowa Dec. 11, 2019) ("Plaintiff's conviction for failing to obey Officer Nissen's commands to stop does not necessarily negate that Officer Nissen unconstitutionally tried to stop plaintiff based solely on plaintiff's race.  Nor does it necessarily negate that Officer Nissen used excessive force on plaintiff when plaintiff failed to stop.  Thus, the Court finds that plaintiff's plea to interference with official acts does not bar his Section 1983 claims under the *Heck* doctrine."); *Thigpen v. McDonnell*, 273 F. App'x 271, 273 (4th Cir. 2008) ("In dismissing the complaint under *Heck,* the district court did not consider Thigpen's due process, equal protection, or First Amendment claims. The defendants concede that these claims are not barred by *Heck,* and thus should not have been dismissed by the district court on this ground.").

### E.      Plaintiff's Will Not Press Her Analogous Equal Protection Claim under RICRA.

Plaintiff's claim in Count 6 under RICRA is effectively identical to her equal protection challenge under Counts 4 and 5.  As to those Counts, Plaintiff demonstrated in the preceding sections that the motion should be deferred to allow time for discovery on the claims.

Defendants contend that RICRA does not support a claim in a public school setting on several grounds.  They argue that RICRA applies only to employment discrimination, a concept which is clearly incorrect both as a matter of the express language of the statute—which includes protection for all forms of contract, real and personal property rights, etc.—and as a matter of judicial precedent.  *See, e.g., Taylor v. Nat'l Invs., Ltd.*, No. CV 17-117 WES, 2022 WL 306367 (D.R.I. Feb. 2, 2022) (Smith, J.) (housing); *Olofinlade v. Atmed Treatment Ctr., Inc.*, No. CV 19-021-JJM-LDA, 2020 WL 1848084, at *3 (D.R.I. Apr. 13, 2020)(McConnell, C.J.) (denial of medical treatment); *Khattab v. Barney*, No. CA 14-261 ML, 2015 WL 1213181, at *2 (D.R.I. Mar. 17, 2015) (Lisi, J.) (" However, their argument is based on the false premise that only an 'employer' can be held liable under RICRA. As previously noted, RICRA does not limit potential liability to employers and has been broadly construed to extend liability to any individuals who discriminate in ways that violate the statute." citation omitted); *See also Doe v. Brown Univ*., 253 A.3d 389 (R.I. 2021) (education).

Defendants also argue that they are entitled to sovereign immunity, notwithstanding that Rhode Island has abandoned sovereign immunity as to municipalities, *see Becker v. Beaudoin*, 261 A.2d 896 (1970) and R.I.G.L. chapter 45-15 and individual defendants would not enjoy it anyway.

Finally, they argue that RICRA cannot apply because the relationship between a public school student and the institution at which she is enrolled cannot fall within the statutory definition of a "contract" within the meaning of RICRA.  None of the cases cited by Defendants addresses this issue.  Each addresses an unrelated claim, primarily breach of contract.  The decision in *Olonfinlade, supra*, supports liability against a Town for its role in denial of medical treatment.

However, Plaintiff acknowledges that the scope of a contractual relationship under RICRA, as applied to a student enrolled in public school in her town of residence, has not been addressed

under RICRA.  Because Count 6 is effectively identical to her equal protection challenges under

Counts 4 and 5 and would require additional discovery to support, Plaintiff chooses not to pursue

Count 6 for a violation of RICRA.

**VII.    CONCLUSION**

As explained in depth *supra*, Plaintiff is challenging the seizure, not the conviction, just

like the plaintiff in the Seventh Circuit case *Mordi v. Zeigler*, 870 F.3d at 708. ("[E]ven if he were

to prevail on his racial-profiling and prolonged-detention arguments, the discovery of the cocaine

found within the car would be just as secure, his guilty plea would stand, and his conviction would,

too. All he can hope for in his Fourth Amendment case would be some form of damages for the

loss of his time and the dignitary insult inflicted by racial discrimination.")  The impact of racial

discrimination on a young person in the school that they attend every day as an integral part of

their socialization cannot be underestimated.

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Brown v. Board of Education*, 347 U.S. 483, 493 (1954).  Almost seventy years after *Brown*, its

message takes on an updated meaning, but it still requires enforcement from our federal courts,

currently in the form of Plaintiff's 56(d) Motion requiring Defendants to fulfill their discovery

obligations.  Only with fair access to information in Defendants' control can Plaintiff and the

community at large adequately monitor the legacy of *Brown v. Board.*

For all the foregoing reasons, Plaintiff respectfully submits that the Motion for Summary Judgment should be denied as to Counts One (1), Two (2), Three (3), and Seven (7), that Plaintiff's Motion to Defer ruling should be granted and that Defendants' motion be denied as to Counts Four (4) and Five (5), in accordance with Rule 56(d)(1) so that Plaintiff may conduct and complete discovery, with leave to Defendants to renew such motion after discovery is completed.

Plaintiff, **T.J. by and through TIQUA JOHNSON,**
By her attorneys,


/s/ Shannah Kurland

**Shannah Kurland, Esq.**  (#9186)
149 Lenox Avenue
Providence, RI 02907
Phone:  (401) 439-0518
skurland.esq@gmail.com


/s/ Lynette Labinger
**Lynette Labinger, Esq.** (#1645)
128 Dorrance St., Box 710
Providence, RI 02903
Phone: (401)465-9565
ll@labingerlaw.com

Cooperating counsel,
American Civil Liberties Union Foundation of
Rhode Island

## CERTIFICATION

I hereby certify that I have filed the within document with the United States District Court on this 14th day of March, 2022 and that a copy is available for viewing and downloading via the ECF system to the following attorneys for Defendants:

Marc DeSisto                                        /s/ Shannah Kurland

marc@desistolaw.com            Rebecca Partington
                                             rebecca@desistolaw.com

William J. Conley, Jr.